**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

JEREMY D. TERRELL,

        Defendant.

No.   15-CR-3051-MWB

*REPORT AND RECOMMENDATION*

---

## TABLE OF CONTENTS

I.      **INTRODUCTION** ............................................................................. 2

II.     **PROCEDURAL HISTORY** .......................................................... 3

III.    **RELEVANT FACTS** ..................................................................... 5

   A.     **The Evidence of Criminal Activity** ........................................... 5

   B.     **The Facts Surrounding the Wiretap Authorizations** ...................... 7

      1.     **First Wiretap** ...................................................................... 7

      2.     **Extension of the First Wiretap** ............................................. 9

      3.     **The Second Wiretap** ......................................................... 10

      4.     **Extension of the Second Wiretap** ....................................... 11

      5.     **Notice of the Wiretaps** ..................................................... 12

IV.    **DISCUSSION** ............................................................................ 13

   A.     **So-Called Pre-Authorization Requirements** ............................. 14

      1.     **A County Attorney is Not Required to Obtain Pre-Authorization from the Nebraska Attorney General** ........................................................ 15

      2.     **The Application Submitted to the Nebraska Attorney General is Not Required to be Signed and Sworn** ................................................... 19

     *3.     A County Attorney is Not Required to Submit an Application and Affidavit in Support of an Extension of a Wiretap to the Nebraska Attorney General* ................21

     *4.     Conclusion* ....................................................................................23

   *B.     Probable Cause* ..................................................................................24

   *C.     Necessity*............................................................................................27

   *D.     Minimization* ....................................................................................30

   *E.     Post-Intercept Notification*....................................................................35

   *F.     Good Faith Doctrine* ..........................................................................38

   *G.     Fruits of the Wiretaps*..........................................................................40

*V.    CONCLUSION*...................................................................................41

# I.    INTRODUCTION

The grand jury charged defendant Jeremy D. Terrell in a three-count indictment with drug-trafficking offenses between June and September 2015.   Doc. 1.[1]   These charges arose out of Nebraska state court wiretaps.   Defendant moves to suppress evidence derived from the wiretaps on a number of grounds.   Doc. 25.   The United States resists defendant's motion.   Doc. 37.

On May 27, 2016, I held a hearing on this motion and on defendant's pending motion to compel the government to disclose the identities of confidential sources referenced in the affidavits supporting the wiretaps.

For the reasons explained below, I recommend the court **deny** defendant's motion to suppress.

---

[1] "Doc." refers to the criminal docket in this case.   "MJ Doc." refers to the docket in the predecessor case in 15-mj-357.   Each is followed by a number corresponding to the docket entry.

## II.    PROCEDURAL HISTORY

On December 9, 2015, the United States charged defendant by criminal complaint with one count of possession with the intent to distribute cocaine and one count of possession with the intent to distribute methamphetamine.   MJ Doc. 2.   Defendant made his initial appearance before this court on December 11, 2015.   MJ Doc. 8.   On December 15, 2015, the grand jury returned a three-count indictment against defendant. Doc. 1.   Count 1 charges defendant with conspiring between June and September 2015 to distribute methamphetamine.   Count 2 charges that, on or about August 29, 2015, defendant possessed, and aided and abetted the possession, with the intent to distribute 500 grams or more of methamphetamine.   Count 3 charges that, on or about August 14, 2015, defendant possessed, and aided and abetted the possession, with the intent to distribute, cocaine.

The court scheduled trial for February 1, 2016.   Doc. 7.   On January 7, 2016, the court granted defendant's motion to continue the trial, setting the trial for a date certain of June 20, 2016.   Doc. 12.

On February 8, 2016, defendant filed an unresisted motion for an extension of time to file pretrial motions.   Doc. 15.   The court granted the motion.   Doc. 20.   On April 14, 2016, defendant filed a motion to suppress (Doc. 25) and a motion to compel the government to disclose confidential informants (Doc. 26).   On the same day, defendant filed a combined brief in support of both motions.   Doc. 25-1.   On April 22, 2016, the United States filed an unresisted motion for an extension of time to file a response to defendant's motions.   Doc. 29.   The court granted the extension.   Doc. 30.   On May 16, 2016, the United States filed a resistance to the motion to compel

disclosure of confidential informants (Doc. 33) and another unresisted motion for extension of time to respond to defendant's motion to suppress (Doc. 34). The court granted the motion for an extension of time. Doc. 35. On May 20, 2016, the government filed a resistance to the motion to suppress. Doc. 37. Defendant later provided the court with a chart of thirty-seven calls he claims the government failed to properly minimize.

At the hearing on May 27, 2016, the government offered Exhibits 1 through 18, without objection by defendant, which I admitted into evidence. Defendant offered Exhibit A, which was a three-page spreadsheet of intercepted thirty-six[2] phone calls, exceeding two minutes in length, which defendant argues should have been minimized. I had printed off copies of the so-called "line sheets" which summarized each of the calls. I proposed adding the line sheets as an addendum to Exhibit A to aid the District Court. Neither party objected to this procedure, and I admitted Exhibit A with the line sheets as an addendum.

Before offering evidence, the government summarized several stipulations the parties had reached:

1) Interception of the wiretap of defendant's telephones terminated on September 15, 2015;

2) Defendant received formal notice of the interception of the first wiretap on January 19, 2016;

3) Defendant received actual notice his telephone calls were tapped during a proffer session on October 26, 2015, and;

---

[2] The spreadsheet actually contained references to thirty-seven phone calls, but defendant indicated that he was withdrawing the first phone call, having realized that it lasted less than two minutes.

4) Defendant participated in two proffer sessions, the first on September 14, 2015, and the second on October 26, 2016, each of which were under terms binding on the United States Attorney's Offices for the Northern District of Iowa and the District of Nebraska, and on the County Attorney's Offices of Webster County, and Douglas County, Nebraska.

At the hearing, the following witnesses testified on behalf of the United States: FBI Special Agent John D. Hallock; Omaha Police Officer and FBI Task Force Officer James "J.P." Paul and Kimberly Woolery, and Assistant Douglas County Attorney Jeffrey John Lux. Defendant did not call any witnesses.

## III.    RELEVANT FACTS[3]

### A. The Evidence of Criminal Activity

On February 6, 2014, the Omaha Police Department (OPD) responded to a call of shots fired. Officers stopped a car defendant was driving in which Calvin Clayton was a passenger. Officers searched the vehicle after smelling marijuana, and seized a loaded 9mm handgun under the driver's seat, and seven grams of marijuana.

On July 8, 2014, local law enforcement officers stopped a car in Sarpy County, Nebraska. The car was rented in defendant's name, and he was a passenger. Another male was driving, and there was another male passenger. After smelling marijuana, officers searched the car and recovered $21,591 in cash.

---

[3] In summarizing the relevant facts, I relied on the affidavit in support of the criminal complaint (MJ Doc. 2), defendant's brief in support of his motions (Doc. 25-1), the government's response (Doc. 37), and the exhibits and testimony presented at the hearing. Some of these facts, however, do not appear in the affidavits in support of the wiretaps. In ruling on the sufficiency of probable cause and necessity for the wiretaps, therefore, I relied only on the facts as set forth in the affidavits themselves.

On July 21, 2014, defendant flew from Montego Bay, Jamaica, to Chicago, Illinois, where agents with the Department of Homeland Security screened him and discovered he was carrying $2,100 cash. Agents searched his cell phone as well, which disclosed photos of him handling bags of marijuana and text messages indicating he was selling marijuana in Omaha.

In the fall of 2014, a joint Federal Bureau of Investigation (FBI) and the OPD initiated an investigation into a series of fourteen[4] armed bank robberies which took place in the Omaha area between June and November 2014. The investigation revealed that Blood gang members, calling themselves the NIKE[5] gang, were allegedly involved in the robberies. Defendant was identified as an alleged member of the gang. During the investigation, law enforcement agents discovered that defendant had rented twenty-two vehicles from Enterprise Car Rental (Enterprise) since June 2014. In June and August 2015, law enforcement officers obtained orders permitting them to intercept telephone communications by members of this group, including defendant's telephones.

As a result of the wiretaps, law enforcement officers came to believe defendant was living in Fort Dodge, Iowa. On August 14, 2015, armed with information from the wiretap, officers with the Fort Dodge Police Department (FDPD) stopped defendant's car when he tried to elude them. When he fled from the car, he attempted to destroy crack cocaine by swallowing it or throwing it. Officers recovered 54 grams of suspected crack cocaine. Officers charged defendant only with felony eluding so as not to reveal the existence of the wiretap.

---

[4] The affidavit in support of the first wiretap referenced twelve bank robberies believed to be the work of the NIKE gang (Exhibit 2, ¶ 32), but Special Agent Hallock testified that he believed officers tied the NIKE gang to fourteen bank robberies.

[5] NIKE apparently stands for "Nigga I Kill Everyone." Exhibit 2, ¶ 32.

On August 29, 2015, FDPD officers and FBI agents attempted to perform a controlled delivery of a package containing three pounds of methamphetamine, which they had previously intercepted in the United States Mail on its way to defendant at a residence in Fort Dodge. No one responded to the door of the house where the agent attempted to deliver the package, but officers saw defendant and another man exit the back of the house shortly after the failed delivery. A short time later, defendant retrieved the package from the Post Office. Agents attempted to stop defendant's vehicle, but he fled from officers, ultimately losing control of the vehicle. Again, officers charged defendant only with eluding so as not to disclose the existence of the wiretap.

### B. The Facts Surrounding the Wiretap Authorizations

In the summer of 2015, law enforcement officers, working with the County Attorney for Douglas County, Nebraska, obtained authorization to intercept telephone calls made by the targets of the investigation. This involved two wiretaps: the first on phones possessed by Qwinton Henderson and Walter Goodwin, other members of the NIKE gang; and the second on phones defendant possessed. The government also obtained extensions for these wiretaps.

### 1. First Wiretap

On June 2, 2015, officers obtained authorization from a Nebraska state court judge[6] to tap the telephones of other NIKE gang members (but none belonging to defendant). The procedure began with the Douglas County Attorney submitting the

_____

[6] The Honorable Gary B. Randall.

Application and Affidavit for Intercept of Communications to the Nebraska Attorney General's Office for a recommendation. The application and affidavit provided to the Nebraska Attorney General's Office was not "signed and sworn." Nebraska law provides that when a county attorney applies for an initial wiretap order, that the county attorney submit the application to the Nebraska Attorney General's office. Neb. Rev. Stat. § 86-291 (2015). The Attorney General's Office must provide a recommendation to the district court within twenty-four hours regarding whether the court should grant the application. *Id*. In this case, on June 1, 2015, the Attorney General issued a recommendation to grant the application. Exhibit 1. This recommendation was provided to the state district court on June 2, 2015, along with the affidavit in support of the wiretap application.

The affidavit in support of the wiretap (June Affidavit) contained a summary of defendant's criminal history, which included felony firearms violations and a conviction for possessing marijuana. Exhibit 2, ¶ 26. The June Affidavit included a background section, in which the affiant alleged that the investigation had revealed that defendant was the leader of a gang involved in robberies and drug trafficking. Exhibit 2, ¶¶ 32-33. The June Affidavit provided the following additional information specifically about defendant: On February 6, 2014, Omaha police officers responded to a shots fired report and stopped a car defendant was driving, from which officers seized seven grams of marijuana and a stolen, loaded handgun. Exhibit 2, ¶ 36. On August 8, 2014, officers stopped a vehicle in which defendant was an occupant, and seized $21,591 cash from the car. Exhibit 2, ¶ 37. On February 10, 2015, near the border with Colorado, Nebraska law enforcement officers stopped a car leased by defendant in which he was an occupant; the car smelled strongly of marijuana, but officers did not find any drugs. Exhibit 2, ¶ 39. In March 2015, a source of information (SOI-1) proffered and told

officers that defendant and Scyrus Keys were large scale marijuana dealers, and defendant was Keys' "right hand man"; officers accessed a Facebook page which showed a picture of Keys and defendant on a plane together. Exhibit 2, ¶ 40. Another source of information (SOI-2), told law enforcement agents that defendant was a gang member involved in a drug distribution network in Fort Dodge, Iowa. Exhibit 2, ¶ 42. A confidential source (CS-1) told agents that defendant and Steville Burns (a/k/a "Dunk"), are involved in crack cocaine production, narcotics sales, and bank robberies. Exhibit 2, ¶ 44. CS-1 was present in April 2015 at an Omaha residence where he saw some of the members of the NIKE gang (but not defendant) manufacturing crack cocaine. *Id*. CS-1 identified defendant as the head of the NIKE gang involved in narcotics distribution. *Id*. CS-1 also identified defendant from a photograph. *Id*. The June Affidavit included additional information about the other members of the gang, including multiple controlled buys made from other members. Exhibit 2, ¶¶ 57-89.

On June 2, 2015, the state court judge granted the application. Exhibit 3. The order provided, among other things, that "the interceptions shall be conducted in such a manner as to minimize the interception of communications (voice) not relating to this order." Exhibit 3, ¶ 13. The order further required the County Attorney to "make interim reports every twelve-sixteenth (12-16) day setting forth the number and nature of calls intercepted" over the target telephones. Exhibit 3, ¶ 17. The court amended the order the following day to adjust the interception to a telephone with a different ESN. Exhibit 4.

### 2. *Extension of the First Wiretap*

On June 30, 2015, the Douglas County Attorney applied for an extension of the wiretap. Exhibit 5. The County Attorney also supported this application with an

affidavit.   A state court judge granted the extension on the same day.   Exhibit 6.   The order granting the extension contains the same language regarding minimization and reporting as the original order authorizing the wiretap.   The County Attorney had not provided the Attorney General with a copy of the application and affidavit, and the Attorney General did not provide the state court judge with a recommendation regarding whether to grant the extension of the wiretap.

### 3.  *The Second Wiretap*

On August 3, 2015, the Douglas County Attorney applied for a wiretap on defendant's phones.   Exhibit 8.   Pursuant to the Nebraska procedures, the Douglas County Attorney submitted the application and affidavit in support of the wiretap to the Nebraska Attorney General's Office for a recommendation.    The copy of the application and order provided to the Attorney General was not signed and sworn.   On July 30, 2015, the Nebraska Attorney General's Office issued a recommendation that the court grant the application to intercept calls on defendant's telephones.   Exhibit 7.   The Douglas County Attorney provided this recommendation to the court when he applied for the wiretap.

On August 3, 2015, the state district court judge[7] granted the wiretap application. Exhibit 9.   The order granting the application contained the same language regarding minimization and reporting as the order for the original wiretap.

The affidavit in support of the second wiretap repeated information contained in the affidavit in support of the original wiretap.   The affidavit also referenced new information obtained from the prior wiretaps and other additional information about

---

[7] The Honorable Gary B. Randall, again.

defendant.    The affidavit recounted the contents of twenty-three of defendant's intercepted telephone conversations between June 6, 2015, and July 22, 2015.    The affiant stated that, based on his training and experience, these intercepted calls reflected defendant discussing drug trafficking.    Exhibit 8, ¶¶ 69, 77, 92, 108, 111, 113, 115, 117, 119, 122, 124, 126, 128, 130, 132, 135, 137, 139, 141, 144, 146, 149, and 152. The affidavit further related instances of physical surveillance conducted by law enforcement agents which corroborated statements made in the intercepted telephone calls, and confirmed connections between suspects and some locations from which they operated.

### 4. Extension of the Second Wiretap

On September 1, 2015, the Douglas County Attorney applied for an extension of the second wiretap, which he again supported with an affidavit.    Exhibit 10. This affidavit summarized another fourteen telephone calls intercepted between August 8, 2015, and August 29, 2015.    The affiant stated that, based on his training and experience, these intercepted calls reflected defendant discussing drug trafficking. Exhibit 10, ¶¶ 22, 23, 26, 30, 32, 34, 36, 38, 40, 41, 43, 45, 46, and 48.    The affidavit also related instances of surveillance by law enforcement officers, and two occasions when officers stopped vehicles driven by defendant from which they recovered large quantities of cocaine and methamphetamine.    The Nebraska state court judge granted the application.    Exhibit 11.    The County Attorney had not provided the Attorney General with a copy of the application and affidavit for the extension, and the Attorney General did not provide the state court judge with a recommendation regarding whether to grant the extension of the wiretap.

### 5. *Notice of the Wiretaps*

The original wiretap ended on August 1, 2015, and the second wiretap ended on September 15, 2015.

On November 3, 2015, the County Attorney obtained from the court an extension of the deadline to provide notice to the people whose calls were intercepted on the first wiretap. Exhibits 13 & 14. Assistant County Attorney Lux testified that he did not seek an extension of the deadline for notice regarding the second wiretap. He explained that he mistakenly believed notice would not be due on that wiretap until January 2016 because of the extension of that wiretap. He testified that he forgot that they "brought it down" or terminated the second wiretap early, on September 15, 2015, such that notice would actually have been due in mid-December 2015.

In any event, on January 15, 2016, the County Attorney signed the formal notices of both wiretaps, and notices were provided to the intercepted parties on January 19, 2016. Notice was provided to defendant through his attorneys because, as Assistant County Attorney Lux testified, defendant was represented by counsel and the County Attorney was concerned about having contact with a represented party if notice had been sent directly to defendant. The County Attorney provided the notice to defendant's attorneys by leaving a copy of the notice for them to pick up at the front desk of the County Attorney's Office, which is the normal procedure for providing discovery to defense counsel in Douglas County.

On September 14, 2015, defendant (through counsel) contacted the County Attorney's Office to request an opportunity to provide a protected proffer, meaning the terms of the proffer agreement barred the government from using against defendant statements he made during the proffer session. During the proffer that day, agents did not tell defendant that they had tapped his calls because the wiretap was still in effect on

his phone.  On October 26, 2015, defendant met with law enforcement officers (at defendant's request) for a second protected proffer.  During the second proffer, the agents told defendant that they had intercepted his phone calls.  The agents provided defendant, and his attorney, with several wiretap interception line sheets containing the dates and times of actual intercepted phone calls.  Defendant continued to make additional incriminating statements after he was told about the wiretaps.

## IV.   DISCUSSION

Defendant moves the court to suppress "any and all . . . evidence, tangible and testimonial, which was derived, directly or indirectly," from the wiretaps.  Doc. 25-1 at 35.  Defendant argues the evidence should be suppressed for five reasons:

(1) The government failed to comply with the Attorney General's pre-authorization requirements;

(2) The government had no probable cause to intercept defendant's wire communications on June 2, 2015;

(3) The government did not demonstrate the interception of defendant's wire communications was necessary;

(4) The government did not comply with the minimization requirements contained in the wiretap orders;

(5) The government failed to comply with the post-intercept notification requirements and such failure caused defendant to suffer prejudice.

Defendant further argues the Good Faith Doctrine does not apply in this case, and the fruits of the wiretaps must be suppressed.  *Id*.

I will address each of these arguments in turn.

### A.     *So-Called Pre-Authorization Requirements*

Defendant argues that wiretap applications and extensions must be pre-authorized by the Attorney General or other designated authority.     Doc. 25-1, at 15-16. Defendant further argues that the Douglas County Attorney failed to comply with these pre-authorization requirements by (1) failing to present the Nebraska Attorney General with signed and sworn applications, and (2) failing altogether to obtain pre-authorizations for the extensions of the wiretap orders.     Doc. 25-1, at 18.     The first of defendant's arguments contains two subparts; (a) defendant's claim that a county attorney must obtain pre-authorization from the Nebraska Attorney General before applying for a wiretap, and (b) defendant's claim that the application and affidavit submitted to the Nebraska Attorney General must be "signed and sworn."     Defendant argues that these are not technical defects and require suppression.     *Id*.     At the hearing, defendant argued that the state court judge relied on the assumption the application and affidavit provided to the Nebraska Attorney General was signed and sworn because, in defendant's view, that is what the statute requires.

The government argues that it complied with the Nebraska statutory requirements. The government argues that federal law allows states to adopt their own system for obtaining judicial approval of wiretaps.     It argues that the Nebraska wiretap statute: (1) does not require "pre-authorization" by the Nebraska Attorney General; (2) does not require the county attorney provide the Nebraska Attorney General with signed and sworn applications and affidavits; and (3) does not require a county attorney to obtain a recommendation from the Nebraska Attorney General for extensions of wiretaps.     Doc. 37-1, at 5-17.

14

### 1. A County Attorney is Not Required to Obtain Pre-Authorization from the Nebraska Attorney General

"A wiretap authorization order is presumed proper and [defendant] carr[ies] the burden of overcoming this presumption." *United States v. Gruber*, 994 F. Supp. 1026, 1046 (N.D. Iowa 1998) (internal quotations and citations omitted). Title 18, United States Code, Section 2516(1) sets forth the requirements for federal prosecutors to apply for an order to intercept wire communications. It reads, in pertinent part:

> The Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division or National Security Division specially designated by the Attorney General, <u>may authorize</u> an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation, or a Federal agency having responsibility for the investigation of the offense as to which the application is made. . . .

18 U.S.C. § 2516(1) (2015) (emphasis added). Thus, under the plain language of the statute, a federal prosecutor must have authorization from the Attorney General or a specifically identified designee before applying to a federal court for a wiretap.

The federal wiretap statute, however, also provides that states may authorize the interception of wire communication. Title 18, United States Code, Section 2516(2), authorizes states to pass their own wiretap legislation. It reads, in pertinent part:

> The principal prosecuting attorney of any State, <u>or the principal prosecuting attorney of any political subdivision thereof</u>, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire, oral, or electronic communications, may apply to such

> judge for, and such judge may grant in conformity with section 2518 of this
> chapter. . . .

18 U.S.C. § 2516(2) (emphasis added). The plain language of this statute does not require state attorneys general pre-authorize a wiretap applications in the manner required for federal wiretaps. Rather, it permits the "principle prosecuting attorney of any State" (*e.g.*, an attorney general), or the "principle prosecuting attorney of any political subdivision thereof" (*e.g.*, a county attorney), to apply for a wiretap. A county is a political subdivision of the State of Nebraska, and the county attorney is the principle prosecuting attorney for a county. *See*, *e.g.*, Neb. Rev. Stat. § 48-1401 (referencing a county as a political subdivision of the State of Nebraska); *Lawry v. County of Sarpy, Nebraska*, 575 N.W.2d 605, 608 (Neb. 1998) (recognizing a county as a political subdivision of the State of Nebraska); *United States v. Banderas*, 894 F. Supp. 2d 1169, 1172 (D. Neb. 2012) (referring to a county attorney as the chief prosecuting officer of a county). Thus, a state may, under the federal statute, enact a law permitting a county attorney to apply for a wiretap without any requirement that the attorney general of the state authorize the application in advance.

Nebraska passed just such a law. Pursuant to 18 U.S.C. § 2516(2), the Nebraska Legislature passed its version of a wiretap statute, which states in pertinent part:

> The Attorney General **or** <u>any county attorney</u> may make application to any district court of this state for an order authorizing or approving the interception of wire, electronic, or oral communications, and such court may grant, subject to sections 86-271 to 86-295, an order authorizing or approving the interception of wire, electronic, or oral communications ... .

Neb. Rev. Stat. § 86-291 (emphasis added). Thus, the State of Nebraska chose to adopt a procedure whereby either the Nebraska Attorney General or a county attorney may apply for an order to intercept wire communication. This Nebraska statute does not

require the Nebraska Attorney General to authorize an application made by a county attorney. The statute does go on to require the county attorney to obtain a non-binding recommendation from the state Attorney General. Section 86-291 of the Nebraska Code provides, in pertinent part:

> At the same time a county attorney first makes application to the district court for an initial order authorizing or approving the interception of wire, electronic, or oral communications, the county attorney shall submit the application to the Attorney General or his or her designated deputy or assistant. Within twenty-four hours of receipt by the office of the Attorney General of the application from the county attorney, the Attorney General or his or her designated deputy or assistant, as the case may be, shall state to the district court where the order is sought his or her recommendation as to whether the order should be granted. The court shall not issue the order until it has received the recommendation or until seventy-two hours after receipt of the application from the county attorney, whichever is sooner, unless the court finds exigent circumstances existing which necessitate the immediate issuance of the order. The court may issue the order and disregard the recommendation of the Attorney General or his or her designated deputy or assistant.

Neb. Rev. Stat. § 86-291.

Thus, under the Nebraska statutory scheme, a county attorney may apply for a wiretap order. When doing so, the county attorney is required to submit the application and affidavit to the Nebraska Attorney General so that the Attorney General can render a non-binding recommendation to the state court. There is nothing in the plain language of the statute that requires the county attorney to obtain pre-authorization from the Nebraska Attorney General. Indeed, the plain language of the statute would permit the county attorney to provide the paperwork to the Nebraska Attorney General "at the same time" that it is provided to the state court judge.

17

The fact that in this case the Douglas County Attorney provided the application and affidavit to the Nebraska Attorney General before he provided it to the district court judge, instead of doing so "at the same time," does not constitute a material noncompliance with the statute. Defendant does not claim otherwise. The court could find no reported cases where a defendant has alleged that a county attorney violated the Nebraska wiretap statute by providing the Attorney General with a copy of the application and affidavit before it was submitted to the judge. The procedure of providing the paperwork to the Attorney General before submitting it to the judge, frankly, makes practical sense; it permits the county attorney to provide the judge with the Attorney General's recommendation at the same time the judge receives the application and affidavit. Defendant has not alleged he was prejudiced by the fact the Douglas County Attorney provided the paperwork to the Attorney General earlier than required, nor can I think of a way he could be prejudiced. Indeed, at the hearing, defendant conceded that whether the Attorney General received the paperwork the day before instead of at the same time as the judge was not important. At most, the county attorney's delivery of the paperwork to the attorney general before, instead of "at the same time" as it was delivered to the court, is a technical violation which does not violate a core statutory requirement. Suppression is not justified where a defect is merely technical. *United States v. Lomeli*, 676 F.3d 734, 739 (8th Cir. 2012).

The authority defendant cites in support of his argument does not change my conclusion. Defendant's reliance on *United States v. Giordano*, 416 U.S. 505 (1974), and *Lomeli* is misplaced because both of those cases involved federal wiretaps and the federal statutory provisions which require the United States Attorney General or a specifically identified designee authorize an application for a wiretap. As explained above, that provision does not exist in the Nebraska statute. Similarly, defendant

attempts to stretch the application of the holding in *State v. Hinton*, 415 N.W.2d 138 (Neb. 1987), beyond its capacity. Contrary to defendant's argument, *Hinton* does not stand for the proposition that the Nebraska and federal wiretap statutes are identical or that all requirements of a federal wiretap are superimposed on a Nebraska wiretap. Rather, *Hinton*'s holding is much more limited; it is restricted to the similarity between definitional sections of the federal and Nebraska wiretap statutes. 415 N.W.2d at 144.[8]

Accordingly, for the reasons stated above, I find the Douglas County Attorney was not required to obtain pre-authorization from the Nebraska Attorney General before applying for the wiretap orders in this case.

### 2. *The Application Submitted to the Nebraska Attorney General is Not Required to be Signed and Sworn*

Defendant also claims that the applications and affidavits submitted to the Nebraska Attorney General had to be "signed and sworn." Doc. 25-1, at 18. Assistant County Attorney Lux testified that the copies provided to the Nebraska Attorney General were not signed and sworn. Assistant County Attorney Lux testified that he did not believe the Nebraska wiretap statute required it. I agree.

The plain language of the statute demonstrates that defendant is mistaken in his belief that the County Attorney was required to provide the Nebraska Attorney General with signed and sworn documents. Nebraska Code Section 86-291 does not say anything about the documents sent to the Attorney General having to be signed or submitted under

---

[8] I am aware that, in dicta, the Eighth Circuit Court of Appeals broadly stated that "[t]he Nebraska and federal wiretap statutes are identical," citing *Hinton*. *United States v. Moore*, 41 F.3d 370, 373 n.1 (8th Cir. 1994). That statement was, however, dicta. Moreover, the statutes are clearly not completely identical, however similar they may be in many respects.

oath. This requirement exists only when the application and affidavit is presented to the judge. Title 18, United States Code, Section 2518 provides, in pertinent part:

> Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application.

Section 18 U.S.C. 2518(1) (emphasis added). The Nebraska statute contains identical language in this regard. *See* Neb. Rev. Stat. § 86-293(1) (2015). Pursuant to the plain language, then, the application must be signed and sworn when presented to the judge, not when presented to the federal or state attorneys general.

A similar issue arose in Illinois, and a court there rejected defendant's argument. In *United States v. Marez-Martinez*, 240 F. Supp. 2d 803, 813-14 (N.D. Ill. 2002), a defendant argued that a California wiretap was defective. Under the California statute, the District Attorney is required to attest that he or she reviewed the application. The defendant in *Martinez* argued that the District Attorney reviewed and signed the application the day before the agent signed the affidavit in support of the wiretap application. The defendant argued this constituted error. The court disagreed, finding it was a *non sequitur*. The court pointed out that the fact the "affidavit was not signed does not mean that the [district attorney] did not review the affidavit . . . ." 240 F. Supp. 2d, at 814.

The same result follows here. Nothing in the Nebraska statute requires the county attorney's submission to the Nebraska Attorney general be signed and sworn. The statute only requires the application be made under oath to a judge. That statute requires the Nebraska Attorney General be provided a copy of the application and affidavit for review so the Attorney General can make a recommendation. That was

done in this case, each time the Douglas County Attorney applied for a wiretap. *See* Exhibits 1 & 7. Moreover, the purpose of the requirement that the Attorney General receive a copy of the paperwork so he or she can provide the court with a recommendation is not affected by whether the copy is signed and sworn. The Attorney General's recommendation is based on the contents of the application and affidavit.

Defendant claims the state court judge relied on the fact that the Attorney General received signed and sworn paperwork. The judge did not testify at the hearing, and defendant conceded at the hearing that his argument relies on the assumption the state court judge interpreted the statute in the same way defendant does. There is no evidence, however, that the judge shared defendant's interpretation or, even if he did, that it affected, in any way, his decision to approve the wiretaps.

Therefore, I find the Douglas County Attorney complied with the statutory requirement for submitting the application and affidavit to the Nebraska Attorney General for a nonbinding recommendation.

### 3. A County Attorney is Not Required to Submit an Application and Affidavit in Support of an Extension of a Wiretap to the Nebraska Attorney General

Defendant argues that the Douglas County Attorney had to obtain pre-authorization from the Nebraska Attorney General not only for each application for a wiretap, but also for each extension of a wiretap. Doc. 25-1, at 20. Defendant argues the wiretaps are invalid because the County Attorney did not obtain pre-authorization for the extensions of the wiretaps. *Id*. There are several problems with defendant's argument. First, as discussed above, under the Nebraska wiretap statute, the County Attorney was not required to obtain pre-authorization from the Nebraska Attorney General for any application or extension of a wiretap. Rather, a county attorney need only provide the

21

Nebraska Attorney General with the application and affidavit so the Attorney General can provide the court with a recommendation.

Second, the Nebraska statute contains language specifically limiting this requirement to the initial application, and not to extensions. The plain language of the statute provides, in pertinent part:

> At the same time a county attorney <u>first makes application to the district court for an initial order</u> authorizing or approving the interception of wire, electronic, or oral communications, the county attorney shall submit the application to the Attorney General or his or her designated deputy or assistant.

Neb. Rev. Stat. § 86-291 (emphasis added). Thus, even if the statute required pre-authorization, instead of simply notice and an opportunity for the Attorney General to provide a recommendation, it would not apply to applications for extensions of a wiretap.

Third, defendant cites to Title 18, United States Code, Section 2516(1), for the proposition that the County Attorney had to obtain pre-authorization for wiretap extensions. Section 2516(1), however, does not apply to state wiretaps. It applies only to federal wiretap applications. *See United States v. Van Horn*, 789 F.2d 1492, 1504 (11th Cir. 1986) ("Section 2516(1) does not apply to an application to a state judge for approval; it applies only to applications submitted to a 'Federal judge of competent jurisdiction.'"). Defendant again attempts to take language from *Hinton*, regarding the similarity of the definitional sections of the Nebraska and federal wiretap statutes, and convert it into a holding that requires all state wiretap statutes comply with all federal wiretap procedures. Doc. 25-1, at 20. *Hinton* does not sweep so broadly.

Finally, defendant's citation to Title 18, United States Code, Section 2516(2), does not support his argument because that section provides that a state can enact its own wiretap statute, with the only caveat that the state statute comply with Section 2518 of

the federal statute. Defendant cites Section 2518(1)(a) for the proposition that attorney general pre-authorization is required, but that is not what this section says. Section 2518(1)(a) provides, in pertinent part: "Each application for an order authorizing or approving the interception of a wire . . . communication . . . shall include . . . the identity of the . . . officer authorizing the application." This does not mean that the Nebraska Attorney General must authorize each wiretap. Rather, Section 2518(1)(a) must be read in conjunction with Section 2516(2), which provides that a county attorney may authorize an application. Therefore, when a Nebraska State wiretap is involved, Section 2518(1)(a) requires each application identify the county attorney authorizing the application. Each of the applications, including extensions, identified the Douglas County Attorney as the officer authorizing the applications, in full compliance with the statute. *See* Exhibit 2, ¶ 2; Exhibit 5, ¶ 2; Exhibit 8, ¶ 2; Exhibit 10, ¶ 2. Finally, and in any event, by its plain language, Section 2518(1)(a) does not apply to extensions of wiretaps.

### 4. Conclusion

For the reasons set forth above, I find that the Douglas County Attorney fully complied with the statutory requirements when he provided the Nebraska Attorney General with a copy of the application and affidavit prior to applying for the wiretap orders so the Attorney General could provide the judge a nonbinding recommendation. The statute did not require the County Attorney to provide the Attorney General with signed and sworn documents. The statute did not require the County Attorney to provide the Attorney General with anything regarding extensions of wiretaps.

## B.    Probable Cause

Defendant argues that the June Affidavit was insufficient on its face to establish probable cause to believe that he "was committing, had been committing, or was about to commit the offense of narcotics trafficking or manufacturing." Doc. 25-1, at 21. The government disagrees, arguing the affidavit provided adequate probable cause. Doc. 37-1, at 20-21.

Both parties agree to the test for determining whether probable cause exists is governed by the Supreme Court's decision in *Illinois v. Gates*, 462 U.S. 213 (1983). There, the court said:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

462 U.S. at 238-39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960), overruled on other grounds by *United States v. Salvucci*, 448 U.S. 83 (1980)). A reviewing court does not make a *de novo* determination of whether probable cause existed; rather, it must afford the issuing judge's decision great deference. *Gates*, 462 U.S. at 236. The Supreme Court cautioned courts about the need for affording proper deference to the issuing judge:

> [W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." [*Spinelli v. United States*, 393 U.S. 410, 419 (1969)]. "A grudging or negative attitude by reviewing courts toward warrants," [*United States v. Ventresca*, 380 U.S. 102, 108 (1965)], is

inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant "courts should not invalidate . . . warrant[s] by interpreting [the] affidavit[s] in a hypertechnical, rather than a commonsense, manner." *Id.*, 380 U.S. at 109.

*Gates*, 462 U.S. at 236; *see also United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995).

I summarized the evidence in the first affidavit in the fact section above. That affidavit, read in its entirety, contains sufficient information to provide a substantial basis for the state court judge to find it established probable cause to issue the wiretap to intercept phone calls on phones used by co-conspirators Henderson and Goodwin. Law enforcement officers had information from multiple sources that defendant and other members of a gang were involved in bank robberies and narcotics trafficking. The sources' reliability was corroborated by each other, and by consensual phone calls and several controlled buys of drugs from other members of the gang. Although it is true that the affidavit does not reflect controlled buys from defendant or direct drug transactions between informants and defendant, that is not required to establish probable cause. Indeed, Title 18, United States Code, Section 2518(1)(b)(iv), "does not prohibit the government from listing someone as a target subject even if probable cause is lacking as to that person." *United States v. Dunn*, 723 F.3d 919, 927 (8th Cir. 2013).

Here, the first wiretap was conducted on the phones of other members of the gang, not on defendant's telephones. It was necessary that the affidavit provide probable cause to believe those members of the gang were using their phones to communicate about criminal activity. It was not necessary that the affidavit additionally establish probable cause for each of the targets, including defendant, agents believed may speak with those gang members. When, later, agents sought a wiretap on defendant's phones, then it was

25

necessary the affidavit establish probable cause to believe defendant would use his phones to discuss criminal activity. That affidavit did so, based in part on incriminating statements defendant made, which had been intercepted during the first wiretap on other gang members' phones.

Defendant argues probable cause was lacking in the original wiretap because the information about him was stale. Doc. 25-1, at 23-24. The law is clear that the mere lapse of time between information in an affidavit and the request for a wiretap is not controlling. Rather, a court must consider the nature of the criminal activity involved. When, as here, the criminal activity is continuous and ongoing, any lapse of time is less significant. *See, e.g., United States v. Macklin*, 902 F.2d 1320, 1326 (8th Cir. 1990) (passage of time between events and issuance of warrant is less significant with continuing criminal enterprise); *United States v. Jones*, 801 F.2d 304, 314 (8th Cir. 1986) (same); *United States v. Lueth*, 807 F.2d 719, 727 (8th Cir. 1986) (continuous and ongoing criminal activity relevant to probable cause determination); *United States v. Ellison*, 793 F.2d 942, 947 (8th Cir. 1986) (same). The affidavit contained some background information about defendant that predated by a year the application for a wiretap, but it also contained information as recent as March 2015 regarding defendant's involvement in drug trafficking. Considering the information in the affidavit as a whole, which supported a conclusion that there was probable cause to believe NIKE gang members were involved in robberies and drug trafficking for more than a year, the information was not so stale as to negate probable cause. *See United States v. Tallma*n, 952 F.2d 164, 166 (8th Cir. 1991) (finding wiretap affidavit supported probable cause finding even though the last drug trafficking activity took place four months before the application for the wiretap).

After reviewing the first affidavit in light of the applicable law, I find it provided the state court judge with a substantial basis for finding probable cause to believe that Henderson and Goodwin were engaged in criminal activity and would discuss criminal activity on their phones.   Defendant does not challenge the sufficiency of probable cause of subsequent affidavits, but as the summary of the facts set forth above demonstrates, those affidavits contained substantial additional evidence of defendant's involvement in drug trafficking.   Accordingly, I find those subsequent affidavits also provided the state court judge with a substantial basis for finding probable cause to believe the targets were involved in criminal activity.

### C.    Necessity

Defendant asks this court to suppress the evidence derived from the wiretaps on the ground that the wiretaps were unnecessary.   Doc. 25-1, at 24-26.   Both the Nebraska and federal wiretap statutes require a showing that normal investigative techniques to investigate the criminal activity were tried and failed or reasonably appear unlikely to succeed.[9]   This is not an onerous burden.   "If law enforcement officers are able to establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator, the necessity requirement is satisfied."   *United States v. Turner*, 781 F.3d 374, 382 (8th Cir. 2015) (quoting *United States v. West*, 589 F.3d 936, 939 (8th Cir. 2009)). Although wiretaps should not be "routinely employed as the initial step in an

---

[9] *See* Neb. Rev. Stat. § 86-293(3) (requiring a showing that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous"); 18 U.S.C. § 2518(1)(C) (requiring "a full and complete statement as to whether or not other investigative procedures have been tried and have failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.").

investigation," "law enforcement officers [are not required to] exhaust all possible techniques before applying for a wiretap." *Macklin*, 902 F.2d at 1326. *See also United States v. Jackson*, 345 F.3d 638, 644 (8th Cir. 2003), ("The necessity requirement of § 2518 insures 'that wiretaps are not routinely employed as the initial step in an investigation.'") (quoting *United States v. Thompson*, 210 F.3d 855, 858-59 (8th Cir. 2000)).

The original wiretap affidavit set out at length the prior investigative techniques law enforcement officers used to identify the members of the criminal gang and the nature of their criminal activities. Exhibit 2, ¶¶ 91-134. These prior techniques included the use of undercover officers (Exhibit 2, ¶¶ 92-94), the use of confidential sources (Exhibit 2, ¶ 95), physical surveillance (Exhibit 2, ¶¶ 96-113), other surveillance techniques (Exhibit 2, ¶¶ 114-99), pen registers and "trap and trace" devices (Exhibit 2, ¶¶ 120-24), search warrants (Exhibit 2, ¶ 125), arrest warrants (Exhibit 2, ¶ 126), grand jury (Exhibit 2, ¶¶ 127-28), interviews (Exhibit 2, ¶ 129), and trash searches (Exhibit 2, ¶¶ 130-33). It explained that confidential sources were unable to provide information regarding the organization and structure of the drug trafficking organization supplying the targets with drugs, or to identify all of the co-conspirators. Exhibit 2, ¶ 55. Contrary to defendant's assertion, I do not find these portions of the affidavit constituted "mere boilerplate conclusions." Doc. 25-1, at 25-26. To the contrary, these paragraphs set out in significant detail the specific techniques used and why the affiant believed these techniques would be insufficient in this case, based the particular nature of the gang under investigation and how the gang operated.

Defendant asserts the lack of necessity is reflected in the lack of specific evidence against him in the affidavit. Doc. 25-1, at 25. Defendant faults law enforcement agents for not attempting "surveillance, GPS tracking, pen registers, search warrants and

trash searches" at defendant's "residence or any place where [defendant] is alleged to stay overnight." *Id*. Defendant has made no showing, however, that the information available to law enforcement officers would have supported, for example, the placement of a GPS tracking device on his vehicle earlier than when it was applied, or search warrants at these locations. Moreover, the law does not require law enforcement officers exhaust every possible investigative technique against every target before they resort to a wiretap. Defendant further faults law enforcement officers for not using the grand jury, interviews, or arrests targeted at defendant prior to June 2015. *Id*. The original affidavit, however, adequately explains why attempts to use these techniques had not worked, or reasonably were unlikely to work.

Finally, defendant argues that the subsequent affidavits "recycled much of the same language from the June Affidavit" regarding the necessity of the wiretaps. Doc. 25-1, at 26. Defendant emphasizes that the affidavit in support of the second wiretap reflected that law enforcement officers "did not attempt to obtain search warrants for [defendant's] residence(s) or arrest warrants for [defendant] personally, despite already learning a great deal about his activities from the wiretaps." *Id*. Defendant has not shown, however, that law enforcement officers had sufficient information that would have supported probable cause either to search defendant's residences or arrest him. Regardless, again, law enforcement officers are not required to exhaust all investigative techniques.

Defendant claims officers used boilerplate language because the affidavit stated that "[t]o date, investigators have not learned of the location to manufacture or store narcotics, firearms and/or drug proceeds." *Id*. Defendant takes issue with this claim because the July Affidavit reflected intercepted calls suggesting defendant was manufacturing crack cocaine in an Omaha residence. *Id*. That officers had some

information about one location where some manufacturing was believed to be taking place does not mean that a wiretap was unnecessary to uncover other locations where manufacturing took place, or where drugs, proceeds, and firearms were stored. And the language does not suggest it is boilerplate when the affidavit, read as a whole, demonstrates law enforcement officers did not know of where all of the criminal activity was taking place, even if they had some information about where some activity might be occurring.

Necessity must be evaluated in relation to the information sought in the investigation. Here, law enforcement officers were attempting to identify all of the members of the conspiracy, their sources of supply, and their methods and locations of operation. Even if during the investigation, officers had gained additional information that would have allowed them to search some residences or arrest some members of the conspiracy, they were not obligated to do so if it would jeopardize the larger goals of the investigation furthered by the wiretap. *See United States v. Scherrer*, No. 15-1861, 2016 WL 929360, at * 2-3 (8th Cir. Mar. 11, 2016) (finding that, in light of the "specific goals" of the investigation, there was a sufficient showing of necessity).

Accordingly, I find that the affidavits provided an adequate factual basis to inform the state court judge why other investigative techniques were not sufficient or likely to succeed in achieving the goals of the investigation.

### D.     *Minimization*

Defendant argues the government did not comply with the minimization requirements contained in the wiretap orders. Doc. 25-1, at 26-27. Each of the orders contained the same language, requiring "the interceptions shall be conducted in such a manner as to minimize the interception of communications (voice) not relating to this

order." Exhibit 3, ¶ 13; Exhibit 6, ¶ 13; Exhibit 9, ¶ 13. This is consistent with the statutory requirement that electronic surveillance "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5).

The Eighth Circuit has explained the government's requirement to minimize intercepted communication.

> Section 2518(5) "does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott v. United States*, 436 U.S. 128, 140, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978). We assess whether the government violated the statute by determining whether the government's actions were objectively reasonable in light of the particular circumstances. *See id*. at 137–38, 98 S. Ct. 1717; *United States v. Padilla–Pena*, 129 F.3d 457, 462 (8th Cir. 1997).

*West*, 589 F.3d at 939. The court must "evaluate the government's minimization efforts on a case by case basis." *United States v. Ozar*, 50 F.3d 1440, 1447 (8th Cir. 1995) (citing *Scott v. United States*, 436 U.S. 128, 139 (1978)). Whether minimization was appropriate in a particular case turns on a number of factors, including the number of targets, the ambiguity of the communication, the complexity of the criminal activity under investigation, and "the extent of the issuing judge's continued involvement in the surveillance." *See*, *e.g.*, *Macklin*, 902 F.2d at 1328; *Ozar*, 50 F.3d at 1447. The burden is on the government to show proper minimization, but the defendant must first make some initial showing of the contested facts before the government is put to that burden. *Gruber*, 994 F. Supp. at 1048. Once the government makes a showing that its efforts to minimize were reasonable, the burden shifts back to the defendant to show that more effective minimization could have taken place. *United States v. Willis*, 890

F.2d 1099, 1102 (10th Cir. 1989) (citing *United States v. Armocida*, 515 F.2d 29, 45 (3d Cir. 1975).

In any event, the appropriate remedy for a failure to minimize calls is suppression of the particular call or a civil suit, not suppression of all evidence from the wiretap. *See*, *e.g.*, *United States v. Smith*, No. S1-4:11CR246 CDP, 2012 WL 4893571, at *5 (E.D. Mo. Sept. 28, 2012).   As the Eighth Circuit Court of Appeals explained long ago:

> Furthermore, even if the surveillance in this case did reflect a failure to minimize, it would not follow that Congress intended that as a consequence all the evidence obtained should be suppressed.   Quite the contrary, 18 U.S.C. § 2517 manifests an intent to utilize *all* the evidence obtained by eavesdropping, and § 2517(5) expressly permits the use in court of evidence obtained by wiretap of a crime other than the crime upon which the court order was premised.   Clearly Congress did not intend that evidence directly within the ambit of a lawful order should be suppressed because the officers, while awaiting the incriminating evidence, also gathered extraneous conversations.   The nonincriminating evidence could be suppressed pursuant to 18 U.S.C. § 2518(10)(a), but the conversations the warrant contemplated overhearing would be admitted.   If appellants, and the unindicted persons whose conversations were overheard, have any remedy under Title III other than the suppression of conversations outside the warrant's scope, it lies in § 2520 as a civil suit against the investigating officers alleging that they exceeded their authority.

*United States v. Cox*, 462 F.2d 1293, 1301-02 (8th Cir. 1972).   *See also Ozar*, 50 F.3d at 1448 (same, citing *Cox*).

At the hearing, Special Agent Hallock, Task Force Officer Woolery, and Assistant County Attorney Lux all testified about the minimization procedures used on the wiretaps in this case.   Prior to each wiretap, the County Attorney conducted a minimization meeting with all of the agents who would participate in the wiretap.   He provided them instructions on the need to minimize and to stop recording after two minutes if an agent

could not determine the call was criminal in nature. The two minute mark was simply an arbitrary time designed to limit the intrusion. Each agent participating in the wiretap signed an acknowledgment of understanding of the minimization requirements. During the wiretap, the agents were supposed to note on the line sheets whether they minimized a call. This was not always done, but an agent is able to determine after the fact, based on the recording equipment, whether a call was actually minimized, regardless of whether this was noted on the line sheets.

Agents intercepted 1,344 calls on defendant's telephone. Of those, 183 were more than two minutes in length. Agents minimized 121 of those 183 calls. Agents minimized another 25 calls that were shorter than two minutes in length. In total, agents minimized 146 calls (approximately 11% of the calls). *See*, *e.g.*, *United States v. Losing*, 560 F.2d 906, 909 (8th Cir. 1976) (finding minimization sufficient where, *inter alia*, agents minimized 79-81 calls out of 1,208 intercepted, a rate of approximately 6.5%-6.7%).

Defendant identified thirty-six phone calls he claims were improperly minimized. That constitutes less than 3% of the total calls intercepted. These phone calls range in date from August 4, 2015, to September 7, 2015, and range in length of a minute to approximately seventeen minutes, with the vast majority of them lasting less than three minutes. Of these calls, the line sheets themselves indicate agents minimized five of them.[10] This means that even though the line sheets indicate the phone call lasted more than two minutes, the agent did not listen in on the entire conversation.

---

[10] The line sheets reflect that the following calls were minimized (referenced by session number, date and start time): Session 107 (8/7/15, at 11:14:55); Session 138 (8/7/15, at 18:27:01); Session 1400 (8/27/15, at 9:06:42); and Session 1405 (8/25/2015, at 10:47:01).

Task Force Officer Woolery testified that she listened to and reviewed each of the disputed calls. She determined that agents had minimized another eight calls,[11] even though it was not reflected on the line sheets. As to the remaining twenty-four calls not minimized, she testified that she spoke with the agents on each of these calls (except for two calls where the agent was not available) and explained at length why agents did not minimize these calls. In each case, there was an adequate explanation that the agent believed the conversations involved discussion of identities of co-conspirators, methods of operating, and incriminating or potentially incriminating statements.[12] Task Force Officer Woolery was unable to provide an explanation as to only one call[13] because the agent who intercepted that call was unavailable to explain why he did not minimize the call and the reason was not readily apparent to Task Force Officer Woolery when she listened to the call.

Finally, Task Force Officer Woolery testified that she provided the state court judge with "fifteen day reports." She explained that this meant that every fifteen days while the wiretaps were active, she provided the judge with an update regarding the wiretaps. These updates included information on the number of calls intercepted, the

---

[11] Task Force Officer Woolery testified that the recordings reflect the following phone calls were minimized (reference by session number, date and start time); Session 211 (8/9/15, at 10:52:43); Session 265 (8/9/15, at 19:04:27); Session 452 (8/10/15, at 18:55:59); Session 545 (8/10/15, at 19:06:20); Session 455 (8/10/15, at 19:09:28); Session 463 (8/10/15, at 19:43:06); Session 550 (8/11/15, at 18:33:19); Session 642 (8/13/15, at 21:33:40).

[12] It should be noted that one call (Session 564 (8/11/15, at 20:36:41)) was a call made from a correctional facility (reflected in the line sheet with a reference to DCYC, which stands for the Douglas County Youth Center). Task Force Officer Woolery testified that this call was recorded by the correctional facility in the normal course of operations and that law enforcement officers have access to those recorded calls.

[13] Session 474 (8/10/15, at 21:05:03).

number of calls minimized, and line sheets on a number of the calls. *See United States v. Losing*, 539 F.2d 1174, 1179-80 (8th Cir. 1976) (noting the importance of judicial oversight of the wiretap while it was in progress in determining whether minimization was reasonable).

Considering the relevant facts and factors, the agents acted reasonably in minimizing the calls. The agents were investigating multiple targets involved in a complex series of criminal acts (including armed bank robberies and narcotics trafficking), employing a large number of people, spanning well over a year, and relating to criminal activity in Nebraska, Iowa, Colorado, Arizona, and California. The targets used code words to communicate about their criminal conduct. Moreover, the agents provided the issuing judge with periodic updates regarding the intercepted calls.

Accordingly, I find the government has carried its burden of showing that the agents reasonably minimized the calls as required by the court's orders.

### E.    *Post-Intercept Notification*

Defendant argues that the government failed to timely notify him that his communications were intercepted. Doc. 25-1, at 28-30. Defendant argues this was not a mere technical violation, but, rather, that he was prejudiced because he made incriminating statements during proffer sessions before agents told him his calls had been intercepted. Doc. 25-1, at 29. The government argues that although it did not provide the full notice regarding the second wiretap in the manner contemplated by the statute within the 90 day requirement, it substantially complied because agents told defendant during the October proffer session that his phone calls had been intercepted, and that defendant was not prejudiced, in any event, because the statements made during this proffer were protected from use by the government. Doc. 37-1, at 25-30.

Both the Nebraska and federal wiretap statutes require, in pertinent part, that, "not later than ninety days after the . . . termination of the period of [a wiretap] order or extensions thereof," the "judge shall cause to be served, on the persons named in the order or the application . . . an inventory which shall include notice of—(1) the fact of the entry of the order . . . (2) the date of the entry and the period of authorized . . . interception . . . and (3) the fact that during the period wire, oral, or electronic communications were or were not intercepted." 18 U.S.C. § 2518(8)(d). *See also* Neb. Rev. Stat. § 86-293(9)(a).

As described in detail in the fact section above, the Douglas County Attorney did not provide the formal notices for the second wiretap within the 90 day window. The government counters, however, that defendant received actual notice of the wiretap on October 26, 2015, well within the 90 day window, when agents told him during the debrief that his conversations were intercepted and showed him and his attorney several interception line sheets. The Eighth Circuit Court of Appeals has specifically addressed this issue. In *United States v. Dunn*, the court found the defendant received adequate notice when the government told him of the interception, even though it is not accomplished pursuant to the formal notice contemplated by the statute. *Dunn*, 723 F.3d at 927 (government provided notice when it provided defense counsel with copies of the intercepted calls within the 90 day period). *See also United States v. Fina*, 405 F. Supp. 267, 274 (E.D. Penn. 1975) (rejecting claim the government violated the wiretap statute for failing to provide timely formal notice when the agent told the defendant of the interception within the 90 day period).

Even if the government had not provided defendant with actual notice during the 90 day period, that does not mean that suppression of the wiretap evidence is the appropriate remedy. The Supreme Court has stated that "[n]othing in the structure of

36

[wiretap inventory provision] or this legislative history suggests that incriminating conversations are 'unlawfully intercepted' whenever parties to those conversations do not receive discretionary inventory notice as a result of the Government's failure to inform the District Court of their identities." *United States v. Donovan*, 429 U.S. 413, 438 (1977). *See also Dunn*, 723 F.3d at 927 ("Failure to meet the notice requirement of section 2518(8)(d) does not render 'unlawful an intercept order that in all other respects satisfies the statutory requirements.'") (quoting *United States v. Davis*, 882 F.2d 1334, 1344 (8th Cir. 1989) (in turn quoting *Donovan*)).

Defendant acknowledges the holding in *Donovan* (Doc. 25-1, at 29), but insists the court suppress the evidence from the wiretap because he claims he suffered prejudice. Defendant cites *United States v. Rotchford*, 575 F.2d 166, 174 (8th Cir. 1978), for the proposition that "technical violations of Title III may not warrant suppression unless there is a showing of improper motive and prejudice to the defendant." Doc. 25-1, at 29. Defendant has not alleged or shown bad faith or an improper motive by the government. At the hearing, Assistant County Attorney Lux testified that his failure to provide timely notice on the second wiretap was simply a mistake by him because he forgot to take into account the early termination of the second wiretap. Therefore, having failed to establish the first prong of improper government motive, whether defendant suffered prejudice as a result of the untimely formal notice is irrelevant. *See United States v. Davis*, 882 F.2d 1334, 1344 (8th Cir. 1989) (stating that suppression is not appropriate for a violation of the notice provisions of the wiretap statute absent a showing of bad faith and prejudice) (citing *Donovan*, 429 U.S. at 439 n.26).

In any event, defendant has not shown prejudice. Defendant claims he was prejudiced because the agents withheld the information that his phone had been tapped when defendant made incriminating statements during a proffer interview. Doc. 25-1,

at 29. He argues that his "decision to waive his constitutional right against self-incrimination by cooperating and providing statements to the Task Force would no doubt have been influenced by his knowledge, after being formally provided, that he was the subject of an extensive wiretap." Doc. 25-1, at 30. Well, I, for one, doubt it.

Defendant has provided no basis for the court to conclude that he would not have gone forward with the interview had he known of the wiretap. Defendant did not testify at the hearing on May 27, 2016. Nor did he present any other evidence to support this assertion. Indeed, it logically makes more sense that defendant's motivation to cooperate would increase if agents had told him they had intercepted his incriminating conversations. And the evidence shows that defendant continued to cooperate even after he was told of the wiretap during the proffer session. In any event, as the government points out, defendant made statements pursuant to a protected proffer agreement which bars the government from using his statements against him as direct evidence of his guilt.

Accordingly, I find that the government provided defendant with sufficient, actual notice of the wiretap within the required 90 day period; and even if it had not, the failure to give timely formal notice was a technical violation which does not require suppression when, as here, defendant has failed to show the government acted in bad faith and has failed to show he was prejudiced by the delay.


### F. *Good Faith Doctrine*

Defendant argues the so-called *Leon* Good Faith Doctrine "does not apply when law enforcement do not comply with the core statutory requirements of the federal law in applying for and executing the wiretap orders" and because "the June Affidavit was so lacking in probable cause and necessity as it applied to [defendant] that official belief in the Affidavit was entirely unreasonable." Doc. 25-1, at 30 & 31.

In *United States v. Leon*, 468 U.S. 897, 923 (1984), the Supreme Court held that suppression of evidence is not appropriate when a law enforcement officer relies in good faith upon a judicial officer's approval of a warrant. The Doctrine does not apply, however, if the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Id*. The *Leon* Good Faith Doctrine applies to wiretap applications. *United States v. Moore*, 41 F.3d 370, 376 (8th Cir. 1994).

I find the *Leon* Good Faith Doctrine applies to defendant's argument that the wiretaps were deficient because the Douglas County Attorney did not obtain pre-authorization from the Nebraska Attorney General in this case. Even if I am wrong, and the law required such pre-authorization, the documents provided to the state court judge showed on their face that the Attorney General was providing only a recommendation and not authorization. In my opinion, the statute is clear that this was sufficient, but it is at least sufficiently debatable that the agents cannot be charged with knowing it was clearly deficient when the district court judge did not.

Similarly, *Leon* applies to defendant's argument that the wiretaps were deficient because the County Attorney did not obtain pre-authorization from the Nebraska Attorney General for the extensions. The district court judge knew from the documents the County Attorney provided him that the extension applications did not contain a recommendation or authorization by the Attorney General. I believe the statutory language does not require it. The district court judge signed the extensions without it. In any event, the extension applications were not so clearly deficient that law enforcement agents should have known the applications for extensions were deficient without input from the Attorney General.

I find the *Leon* Good Faith Doctrine is not applicable to the question of whether the Douglas County Attorney was required to provide signed and sworn applications and

affidavits to the Nebraska Attorney General.   I firmly believe the statute does not require this, but the state court judge would have had no way to know whether the county attorney did this.   Accordingly, the state court judge's action approving the wiretaps is irrelevant to whether this was a violation of the core requirements of the statute for which suppression is required.

I find the *Leon* Good Faith Doctrine applies to both of defendant's probable cause and necessity arguments.   Even if a reviewing court disagrees with the state court judge that the applications established probable cause and necessity, the showing of probable cause and necessity were not so facially deficient that law enforcement offices would unreasonably rely on the state court judge's conclusions.

*Leon*, of course, does not apply to the minimization and notice arguments because these events took place after the state court judge approved the wiretap warrants.

### G.    *Fruits of the Wiretaps*

Defendant argues that if the "original wiretap was improvidently granted, the government cannot use the fruits of that wiretap to obtain authorization for later interceptions."   Doc. 25-1, at 28.   In the penultimate portion of his brief, defendant repeated his argument that the fruits derived from the wiretaps must be suppressed because the wiretaps were deficient.   Doc. 25-1, at 30.   I agree that the law generally provides that if evidence is derived from a wiretap deemed unlawful, it should be suppressed, unless there is an independent source for that information.   *See Giordano*, 416 U.S. at 529-30.   Here, however, I find that the wiretaps were not improvidently granted, so this issue is moot.

## V.    CONCLUSION

For the foregoing reasons, I RESPECTFULLY RECOMMEND that defendant's motion to suppress (Doc. 25) be **denied**.

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Crim. P. 59(b), and LCrR 59 must be filed within seven (7) days of the service of a copy of this Report and Recommendation; and any response to the objections must be filed within two (2) days after service of the objections.    (Deadlines modified from rules due to approaching trial date).    A party asserting such objections must arrange promptly for the transcription of all portions of the record the district court judge will need to rule on the objections.    LCrR 59.    Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.    *See* Fed. R. Crim. P. 59.    Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein.    *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 31ˢᵗ day of May, 2016.

_____
C.J. Williams
United States Magistrate Judge
Northern District of Iowa

41